My name is Joel Spence. I'll be speaking on behalf of Ms. Song. Before we begin, I feel the need to apologize to the Government Council, this Court, and the staff for having made a mistake in the citation. I cited a – I used the name of a Seventh Circuit case rather than the Ninth Circuit case that quoted that case and adopted the analysis that the Seventh Circuit used. And that was my error, but it's really illustrative of what this case is all about. Everybody associated with this case, with the exception of Government Council and Ms. Song's body, made very important errors. And the issue is, what do we do about that? Beginning with the Chinese government that erroneously imputed anti-government political opinion against a church lady, and then had the audacity to make another error in one of the three documents that they issued upon the case. The previous counsel, the interpreters, the translators, the immigration judge, the BIA, all made errors. Is that the only inference one can take from the inconsistencies? Because if one can take another inference reasonably, as the immigration judge did and as the Board of Immigration did, then we can't overturn that unless we are compelled to find differently. Precisely. Now the problem I have is this. Your client says she was arrested in a church on a Sunday or on a Tuesday. That can be an error. But the school letter says she was arrested on a Wednesday, and the school letter says she was arrested not in a church and not because she was a Christian, but because she was a member of an outfit called Zonggang, which is a meditation society, somewhat different from what we consider to be mainline Christian philosophy, right? That's correct. That's an inconsistency flat and out, isn't it? That's the main issue. What do we do when a refugee has a document from the persecuting government that's an error? There are other documents from the same persecuting government that corroborate her story, but this particular document creates a problem for her. Does she hide the document, pretend it doesn't exist, or does she bring it to the judge and say, Your Honor, I had problems in China, and this is one of the documents they gave me, but the document has problems. What do you do? The document still has pulpit of value. It's not a fraudulent document. It's a legitimate document with errors in it. It still has pulpit of value because it still shows that she was persecuted, even despite the fact that there are two errors in the document, the date and the basis of the persecution. What we can do then is we compare it with the other documents that the Chinese government also provided and try to decide which documents are telling the correct story. If you compare it to the first document issued by the person who was doing the torture and who made the decision to detain her and interrogated her, the person who would know and who created the document immediately, he stated it was because of Christianity, he stated that she was arrested at a Christian gathering, and he put the correct date down. Somehow, when the information finally got to her workplace so they can fire her and destroy her ability to make a living in China, due to some clerical error, it got messed up. So you would use the document that's closer to the incident, that's created by a person who's more likely to know. But the issue is, what do you do once you get to immigration court? Why is the government police more likely to know than her school? Because they're the ones that did it. They're the ones that arrested her. They're the ones that interrogated her. They're the ones that tortured her. They're the ones that made the decision to detain her for 15 days. And then they have a different date. They have the 18th. They have the 18th. The 18th where she says the 23rd. Her declaration says the 23rd. Later in her testimony, she says the 18th. That's correct. And we have a long line of cases in the Ninth Circuit that says that dates really Well, dates don't matter, but the question, when they're this close, particularly, at least they don't matter to me. But the difference between a Sunday and a Thursday could matter when you're dealing, a Tuesday, when you're dealing with a church. I mean, it does appear that she was basically saying that it was on, they were worshiping on a Sunday. She said that they normally worship on Sunday, but they also worship on other days of the week. And she had forgotten which day of the week that she was arrested. People's minds work differently. Some people, how many husbands in the United States forget their wedding anniversary? Not that it's not an important date. Not that they don't passionately love their wives. And because they forget their wedding date doesn't mean they're not married. They're still married. They still love their wives. People's minds work differently. And hers, she, according to, she gave plenty of detail about the actual persecution. And as a matter of fact, she said, I still remember the taste of being shocked. She remembered the trauma. But the trauma may very well, as quite often happens, the trauma may very well cloud your memory as to which day it was. She was depending on the fact that she more often attended on Sundays. And when she sat down to remember and write it out, she made an error. You're not claiming she wasn't given an opportunity to explain her inconsistency. She was. She did. As a matter of fact, before The inconsistency explanation was, I don't know. Her explanation was, I don't know how they got these things wrong. That's her explanation. On the document was her explanation. And she got required to know. The document in question was a second-hand, the information that whoever wrote that document had was obviously second-hand. And the details didn't matter to it, because essentially what they were doing was deciding that this person ought to be fired because of illegal, what they considered to be illegal activity. And when it happened and even exactly what it was didn't really matter particularly. And this was, after all, communist China that we were dealing with. So that doesn't bother me particularly. Her own confusion is of a bit more concern. Again, not as to the, whether it was, I mean, I can't remember things within five-year intervals as to when things happened. I'm still not quite sure as to what happened. But what you do attach to an incident are sort of things that date things that matter, like sequence, for example. And I'm curious as to whether the difference between worshipping on a Sunday and worshipping on a Tuesday is not that sort of thing, since ordinarily Christian churches meet on Sunday. So meeting on Tuesday, you'd think, would be unusual. Yeah. Well, let's not be too ethnocentric because in China they worship many different days of the week because they have to accommodate an autocratic government. They have to do it in hiding. True, Sunday is still the most common day that they worship. But it's not that uncommon to have prayer groups during the week as well. It's not that uncommon for Christian groups to meet during the week in addition to Sundays. That's correct. That's correct. And she made the error of presuming that she was arrested on her most – the day of the week that she would most commonly – Was there any other reason that the IJ gave other than the state discrepancy? Well, the date and the document were the two main reasons that he gave. He stated those are the two main reasons. Okay. If you want to reserve any time, you should do that. I would. Thank you. Good morning. May it please the Court, my name is Jeremy Peterson. I represent the United States. The transcript before this Court in this case shows evasive testimony. And it shows inconsistencies not just about the date but also the day of the week, which is very important.  That is, was it 15 days or was it 10 days as it would be with the other date? What treatment she received while she was detained goes among several other things. Well, doesn't the letter from the Security Bureau letter, doesn't that corroborate her testimony as to how long she was detained? She says 15 days, and the custom in China, I believe, is you don't count the day of arrest and the day of release. That's not my quarrel. Whether that's true or not, I don't know. I don't want to speculate about that. I'm just saying the July 4th release date is in her asylum application, and that's the same date she's saying now. So if she had been arrested on the 23rd, as she initially said, twice, or if she had been arrested on the 18th, that substantially changes the amount of time she was detained. By her counting mechanism, not counting the end points, it would be 15 days if she was arrested on the 18th. It would be 10 days if she was arrested on the 23rd. That's a pretty substantial difference. It's substantial enough that one would expect a more accurate testimony on that the first time around. This Petitioner, remember, has been interviewed by the asylum officer. She's had a full and fair hearing on the record before the IJ, and has had the case reviewed by the BIA. It comes before this Court now, a very differential standard, a substantial evidence review. And this record, replete with inconsistencies, and also several examples of evasiveness, is not the sort of record that compels this Court to find that the IJ or BIA erred. What we've basically got before us is a credibility determination. Credibility determination is maybe the archetypal question of fact. And reviewed here, the IJ considered documentary evidence, her testimony, and also explicitly the Petitioner's demeanor. These are evaluations that the IJ is best positioned to make. But did he do any of those things here? Did he consider the demeanor? Yes. Yes, he did. If you look at page – you know, it's very apparent from the testimony. It's also, however, mentioned by the – on record, page 35, the sixth page of the IJ decision. What's the site? It's 35 of the record, or page 6 of the testimony. He notes the Petitioner was at times reluctant to respond to direct questions put to her. And that's very evident if you look at the record. Three specific instances. The first being on page 96 of the record. She's asked whether she was injured by the electric baton. This isn't the issue of where she was shocked. It was another big issue. It's whether she was injured. The judge stepped in and directly questioned her. Were you injured? Again and again he asked her. She evaded the question multiple times before finally admitting that, no, she wasn't. Second example, whether she was shocked on the eye or not. This is on page 77 of the record. She directly says she was shocked on her eye. Then a few minutes later in the hearing, which is on record 101 to 103, she lists where she was shocked specifically. The judge, not hearing the eye, steps in again and asks her, where was it exactly you were shocked? She lists the examples again. Then she says – then the judge asks, weren't you shocked on your eye or something to that effect? And she says, no, I didn't say that, even though just a few minutes before she had said that. Third example, on record page 87, this is – she says she became a principal in 2000. On record page – record – the document on page 285 has said she became principal in 1992. The judge asked her about this. Actually, it may not have been the judge. One of the counsel asked her about this, and she again evaded the question, just began to talk about the school's name. This sort of demeanor can be very revealing. It's something that the IJ can consider and, in this case, did consider. Was she – was she testifying through a translator? She was testifying through a translator. And actually, it appears that he didn't consider it, because he said essentially the response was that time is reluctant, but such matters do not go to the heart of the claim. Well, that – I would argue that that second part you read is actually pertaining to the first part of the sentence where he's talking about the gravity of those inconsistencies. I shouldn't say gravity, because we're not here to weigh the inconsistencies. He's talking about whether they go to the heart of the claim. So he was talking about those, specifically the dates when she became principal. She said, well, became principal in 1992. Elsewhere, she'd say 2000. The judge said, listen, that does not go to the heart of the claim. But my point is simply that there is really no indication here that he regarded her demeanor as a reason for finding her not credible. Well, Your Honor, I would argue that you could read that two different ways. I do understand your point that he made the comment in the context of the minor inconsistencies. But we are here charged under Elias Zacharias to consider the record as a whole and whether it compels a contrary finding. And to that extent, the record testimony, the testimony before the IJ, which is the bulk of the record here, reveals great examples of evasiveness, which – Would you address the point of the Petitioner's counsel saying what – doesn't it show her honesty in coming forward with the school letter when the school letter is inconsistent because she has – she wants to come forward with all the evidence that there is? It might or it might not. I believe that's also susceptible to a different explanation, which is that it's just evidence that was pulled together in a – maybe the application, maybe she didn't look it over very carefully. Who knows where she got it from? Certainly, it's just that they have – Well, coming forward with a letter which is inconsistent is worse than a crime. It's a blunder. It may be a blunder or it may reveal that, in fact, some elements of what is in the letter, what is in that other documentary evidence, is not – How does the letter help her at all? How does the letter from the school – School help her. Well, it shows – It has a different date – it has a different date of her being arrested, 6-26, which is a Wednesday, which is neither a Monday or a Tuesday. It doesn't help her there. And it gives Zhang Gong, instead of Christianity, as a reason that she is arrested. I mean, either her counsel didn't read the letter very carefully or she didn't read very carefully because she's contradicting herself. Well, that's one way of looking at it. And certainly, the government would suggest that the inconsistencies do – are substantial in that letter. But as Judge Berzon mentioned earlier, you could also see that letter as evidence that, in fact, she was discharged. Maybe – maybe the court could read it – maybe the Petitioner was hoping the court would read it as insignificant of a date. It would just show it as evidence that, indeed, she did work at the school. But in the end – I mean, it turns out the IJA's reaction to all this was somewhat similar to ours because he says – because he – that he gave her otherwise unauthenticated documents little weight. So he doesn't seem to be relying on that. That's what he said. He said he wasn't. Well – Or he said it wasn't much. You know, that particular statement in the IJA's opinion is a little bit difficult to interpret. I think we do have to remember this is an oral opinion and give the IJA a little bit of a break in what he was saying there. I mean, he did say in a paragraph above that that, indeed, it's the Petitioner's own documents that are her undoing. Those are my words, not his. But he said basically it's these documents which undercut her testimony and may have forced her to change her testimony from the 23rd to the 18th. Without these documents, things would come together a lot more clearly. I read his statement there that you just mentioned as saying that little – they provide little supportive weight in the context of, you could say – Helping her. Of course, yes. Helping her. That may be. But we're giving him – we're cutting him slack, and the question is do we cut her slack for five days as well? Because that's what we're really talking about. Well, to that end, I mean, I mean cutting him slack in terms of it being an oral statement. The Petitioner's statements were written. She had a lot of time to consider them. In fact, she had years to consider them before revising them, before she finally came up with a different statement on the 21st of April, 2005. One thing to note, this is – this is not a case in which the IJ did not give short shrift to the Petitioner's explanations or did not explain his own decisions. He explained very specifically, and in fact the BIA also explained, why the inconsistency of the day was significant. The Sunday versus the Tuesday, or perhaps a Wednesday, as came up in the other letter. He also – But why is it significant? It's significant because the day of worship is something important in the religion, Sunday being the day that she usually worships. And in fact, as you mentioned earlier, she says twice in her written statements, we worshiped every Sunday, and then on the 23rd they came to arrest us. The idea being this was the ritual, was to go to church on a Sunday, and that that's when she was arrested. That's a very crucial detail, and it would stand to reason that such an important detail would be the kind of thing you'd remember. Maybe you wouldn't remember the exact date, but you'd remember the sort of day. Sunday is the day when she doesn't work, she testified, but during the week she usually goes to work, to church, when she can on Tuesdays, when work permits. Sunday is a different kind of day. It also changes this length of detention. As – you know, there was some confusion over whether we're talking about the end days, which would be the difference if you're arrested on the 23rd versus the 18th. That's a 50 percent difference in length of detention time. That would be something that someone would be likely to remember. It's also important, as the I.J. mentioned, to remember that this is an educated person we're dealing with, a high school principal by her testimony. Did she testify as to how she got the documents that she submitted? Yes, she does, at least as to the statement from the government, which now says the 18th. She says that that was given to her on the 20th of June of 2002, after she'd been arrested, while she was in prison. We don't know about exactly when the other notice from the school arrived, although we said it appears to have been translated in 2003 sometime, between the I.J.'s hearing and – excuse me, before the – between the asylum hearing and the I.J.'s hearing. But I would argue that if she got this original 18th document allegedly on the 20th of June, then it makes no sense that that date would mismatch with the dates that she twice wrote out when she was actually detained. Okay. Thank you very much. Thank you very much. We have about a minute here for a bow. Thank you, Your Honor. The biggest obstacles we have to getting grants of asylum is the interpretation process, and this record is replete with problems with the interpreter. Twice she admitted that there was – that she made an error. And many times when there's problems with the interpreter, for example, when she's asked a when question and she gives a what answer from her own attorney on page 82, it's because there's interpretation problems. The interpreter isn't giving the question exactly as it's asked. And the refugee is responding to the question that they hear. But what – how is that relevant to the grounds here? When his basis – It's not relevant to the date problem, right? It could be – it's not relevant to the date problem. Not relevant to the date problem, but he – But it could be relevant. And this gets interpreted as evasiveness when you have interpreter problems. But it could be relevant to this electric baton problem, maybe. Precisely. It is relevant to that. Okay. Thank you very much, counsel. The case of Zhang versus – the case he has submitted, the case of Harrelson versus Astro is submitted on the briefs. We'll go to Allstate Insurance Company versus Vanderhay.
judges: Berzon, Bea, Gutierrez